In 1999, Congress wrote a law to benefit tens of millions of Americans who live in medically by which a foreign-born doctor who would serve a certain number of years in that underserved area could get permanent residence. That law was then interpreted by INS regulations in the year 2000, which substantially restricted the language of the law and contradicted the Congressional intent. Two years later, we brought a lawsuit challenging the regulations on behalf of eight alien physicians, who have now been reduced to four since the Immigration Service has granted four of the cases. Our position is very clear that the Chevron Step 1 test should apply. If the intent of Congress is clear, that's the end of the matter. We believe that where the U.S. District Court judge erred was by just assuming that the statute was ambiguous, with very little analysis, and then turning all her attention to whether the regulations, whether they're reasonable or not. If I can bring up one simple example, the law provides that its benefits are given to any alien physician, those three words. The regulations say no specialists need apply, and I could bring many examples. We've had six specific areas that were challenging, but I would be happy to take your questions unless you'd like me to go through those examples. You might want to save your time for rebuttal. Okay, thank you. It's hard for you to stand. You can sit down. Thank you, Your Honor. I think I can stand. It was just a question of making it from the table. May it please the Court, I'm Assistant United States Attorney Joanne Osnoff, and I represent the Defendant Appellees. It has been long settled that courts should defer to the administrative agency to administer congressionally created programs. Chevron requires deference to the agency construction if it is a reasonable interpretation, even if the court, whether it be the district court or this court, might have adopted a different construction if presented to the court first. That's if it could be on Stage 1. Yes, that's true, Your Honor. And the argument here appears strictly on Stage 1, I think. Let me just ask you. One of my central concerns is that Congress carved out an exception for J-1, these immigrants. It did not carve out any other exceptions. By the normal principles of statutory construction, doesn't it mean you count everything except the J-1s? The computation of time, Your Honor, in this very statute is silent on the specific computation of time. The start date for the computation of time and the manner of qualifying time are not defined. The regulations have stepped in to provide that definition. The statute itself is prospective in nature. The language of the statute speaks to physicians who provide a present agreement to work, physicians who agree to work, not past work. Nothing in the statute prevents- I don't think you're quite getting to my question, which is Congress seemed to know what it could do by saying it doesn't count if you're in J-1 status. The negative inference from that is that it does count if you're in other status. But, Your Honor- That's, I think, one of the most powerful arguments they have on the other side. So I'm asking your specific response to that question. Yes, Your Honor. The statute, while the statute does not count J-1 time, J-1 is a status that is given to a medical student. That is a student status, a training status. The purpose of the statute would be to provide medical doctors to underserved areas, which is not accomplished through the J-1. With regard to the other status to which the Court describes, the statute and the agency in its interpretation of the statute looks to the provision of the I-140 Petition for Immigrant Worker and the Natural Interest Waiver and the approval date of that. And they do that because the statute is prospective in nature, because the statute speaks to providing the agreement to work. Also, the fact that the agency does this is quite common in the provision of immigration benefits, that it's the date of approval of those benefits from which the clock starts to run. Here, it's the date of approval of the petition and the natural interest waiver, of which all of the doctors remaining in the lawsuit have their natural interest waiver. Except that the J-1, that your argument would make the J-1 provision utterly superfluous, because one cannot serve as a doctor in an underserved area while you're a medical student. You aren't a doctor. You don't meet the definition. So why would Congress have included the J-1 exemption if it, go ahead. No, I mean, it doesn't make any sense for Congress to have, for me, just in looking at the, in trying to do a straight statutory construction of this in an honest way that gives meaning to the structure of the statute and give effect to all of its provisions, the J-1 provision, at least in my reading of it, and maybe you can have a different one you can pursue, would be completely irrelevant if under your interpretation, because medical students wouldn't qualify as doctors in underserved areas. Yes, Your Honor, and they wouldn't have, that would be accurate. In other words, you have to have the agreement, as you said. So why would Congress put in a J-1 exemption if it didn't intend that you could make an agreement in another category, HB-1 or something else, and have that time count? It's that very agreement, Your Honor, though, that doesn't exist prior to the approval of the I-140 and the Natural Interest Waiver. The Natural Interest Waiver and the I-140 require an additional attestation that the work is in the public interest. That comes from a State Department of Health with the application for the Natural Interest Waiver and the I-140. That is not there with past employment. That has not been provided. The J-1 is a little bit interesting because of the Conrad Amendment that exists with the statute. The Conrad Amendment to the INA provided that a J-1 physician or medical student can waive the foreign service requirement, pardon me, the foreign residence requirement. A J-1 has a two-year return requirement. They are to go back to their country. The J-1 is a non-immigrant status. It's a temporary permission to be in the United States. Technically, as is also true for the H-1B and the O. I said H-B-1 and not H-1B. I understand that, Your Honor. The Conrad physician agrees that he will not return to his country. He gets a waiver of that two-year return, and he agrees to serve in a medically underserved area, which qualifies to be in the public interest. The J-1 there, in that circumstance, can convert. Rather than having an eight-year time, the three years that he serves in the medically underserved area and five years beyond for his adjustment, he would have a five-year time period. In that circumstance, the national interest, the public interest in his employment, is already confirmed by the agency. It's not so with regard to the medical student or the physician-in-training on the J-1. The statute and the agency in each instance has tried to fill in gaps that are left in the statute. But if I might stop you, H-1B is granted. The person is working in an underserved area that is later declared to be in the national interest. In the real world, the national interest has not changed from the time of approval to the time prior to approval. Let's say you've been in H-1B in my home state of Montana, where we do need physicians, in a rural area. You've been there for four years. Well, the determination that that service is in the national interest, it really hasn't changed from the day before approval to the day after. The physician is still doing the same work. That may be true, Your Honor, but the non-immigrant physician that comes in on the J-1 status or the H-1B or the O status does not have that limitation on their work within their status. If they have an appropriately approved petition, they have authorization to work, and they can do so anywhere. While they may be, in fact, have chosen to do it in the area that's medically underserved, there is no prohibition on that physician from immediately applying for an I-140 and a natural interest waiver if, in fact, that physician is seeking to convert status to become an immigrant, and ultimately a lawful permanent resident, and perhaps ultimately beyond that, a citizen of the United States. This is a unique program to serve a need, but it's also a program that has to be monitored by the agency and that the physicians that are part of that program to qualify for it. There is the delays that one may see here are not delays by the agency, but are rather physicians that simply did not apply for the program that exists, that gave the agency no indication that they intended for their stay in the United States to be anything other than temporary. It is with the application for the natural interest waiver and the I-140 petition for immigrant worker that that status changes. And it is with that change of status that this program provides for a shortened route to lawful permanent residence. The natural interest waiver eliminates the Department of Labor certification that any other physician would be required to obtain in order to have an employment-based approved petition. That labor certification is a lengthy one and requires, in this case, the individual physician to provide documentation indicating that there is an insufficient number of equally qualified domestic workers and that the alien's employment will not adversely affect persons in the United States. It's a substantial benefit, therefore, for the physician who applies for this program in that he no longer has to comply with that certification process. The other portions of this statute that the plaintiff attacks, which are discussed in the government's brief, are, as he indicated during the beginning of his argument, is with regard to the individual doctors. The individual doctors here have all received their I-140 and the natural interest waiver. It is only Dr. Kasturi who has not, and the government contends that Dr. Kasturi's claims are moot. When Dr. Kasturi applied for the natural interest waiver and I-140 petition, he was sent a request for evidence, which he did not respond to. A substantial period of time went by and the government sent him a notice indicating that his application was denied for abandonment. There is no plaintiff to challenge the definition of physician. And yet, nonetheless, even if this Court is to look to that, the regulations and the statute reference specifically the Department of Health and Human Services definitions of shortage of healthcare professionals. The Department of Health and Human Services looks to non-federal doctors providing direct patient care within the area. And the direct patient care that the Department of Health and Human Services looks to and authorizes is patient care in the areas of internal medicine, family practice, general medicine, pediatrics, obstetrics and gynecology, and psychiatry. And those are the areas that the Department of Homeland Security, through the Citizenship and Immigration Service, incorporates into this statute. With regard to plaintiff's challenge for aggregate service, the regulations require that the five years of service be conducted in a six-year period. Where is there any support for the six-year limitation in the statute? The statute does not identify a definition of aggregate, and the statute does not identify a start time or an end time. And it is because of that. But the definition of aggregate, using aggregate in its normal term, that means you add things together, right? Yes, sir. So where – I don't understand the six-year limitation, how that can derive from the statute. The statute provides for five years of full-time work. What the agency was doing by allowing that five years to be completed in the six-year time frame was giving consideration to an individual physician who may have an injury, an illness, if it's a female physician, may have a pregnancy, may have to travel home for some reason, that would break the service. So the agency adopted a regulation that would make consideration for unforeseen events. What's the difference between, say, a six-year and a 10-year under your rationale? Well, the problem with the 10-year, Your Honor, is from the 10-year one can leap to a 25-year. No, I said what's a 10-year? That's not to say, well, it could be forever. Well, the problem – I don't understand the six-year. Can you explain it to me? I don't understand where it derived from. I mean, I understand that the agency may want to have accommodated some period. Why did it pick six? It picked six as a reasonable number to accommodate the five-year service requirement to deal with unforeseen events and nonetheless serve the purpose of the statute, which was to provide – I'm sorry. If Congress had wanted to say you can't aggregate beyond a certain number of years, couldn't it have just said so? It could have, Your Honor, but it didn't. And as a result of that gap in the statute, then the agency has filled it in with its regulation. Why is it a gap as opposed to just Congress saying you can aggregate, period? Well, Your Honor, if it's not a gap – Why are you presuming that it must be you can aggregate but not more than X years? You're adding something to the statute that's not there, aren't you? Yes, the agency is filling in where the statute is silent, which the agency is permitted to do. Or alternatively, if we're filling in – You're putting a statute of limitations on a statute that doesn't contain a statute of limitations, basically. The agency is looking to serve the purpose of the statute by obtaining the medical care in the medically underserved regions now as opposed to years from now. The desire was not to have individual physicians work for a short period of time. The statute speaks to full-time employment. It's looking to accomplish the goal of the statute within a reasonable period of time, and that's how the agency set the aggregate service requirement. The last two challenges that are made by the plaintiffs to this case deal with the effective date and the tracking dates. The agency, through its regulations, identified – Oh, pardon me. The statute itself identifies a five-year full-time service requirement, and for petitions that were filed prior to November 1, 1998, the statute identifies a three-year service requirement. The statute became effective on November 14, 1999. The agency, by setting the dates that it has, complies with the statute and also provides a recognition that there are petitions in the pipeline at the time that the statute became effective. Thus, once the statute is effective, anything that is pending, the statute applies to it. With regard to any petitions that were filed before and denied, which is the case of one of the plaintiffs, Dr. – Excuse me, Your Honor. I believe that is the case for Dr. Tandar. With regard to that, Dr. Tandar filed a petition which was denied. You're talking about the I-140, the initial one? Yes. But then it was granted later. Yes. It was a subsequent – there was a subsequent petition. But his initial one was denied before the new statute took effect. That denial – the plaintiffs seek to avoid that denial and simply look as though it didn't exist. But to do that eliminates finality of agency decision. It requires the agency has a certain number of resources that it can allocate to this. And further, it requires the agency to balance those resources. The statute does not provide for retroactivity. There's certainly no language to that effect. It is the agency's desire to provide for pending petitions and to fill in the silence with regard to past petitions. Plaintiff's argument is, in effect, a classic floodgates argument, if you will, Your Honor. Anything that was filed before the statute should apply now that the statute exists, despite the fact that there was a denial. And, in fact, in order to adjust status and to get the benefit of the National Interest Waiver, one must have been eligible for it. In other words, one must have had an approved I-140 and Natural Interest Waiver. The last challenge that comes to the statute and the regulations deals with a tracking. The agency requires, by regulation, that the individual physician provide a notification 120 days into the program and 120 days before their service time is over. The reason for that is simply to track the physicians to know that they have continued in the program. There is nothing that prevents a doctor from dropping out of the program. And the notification is without fee and does not provide any loss of service computation. It is simply a way for the agency to manage the Natural Interest Waiver program. I see that I'm almost out of time, Your Honor. In conclusion, the agency's regulations in each instance seek merely to deal with statutory silence or to fill in a gap left by Congress. And in that they serve that purpose, then they are entitled to deference. Thank you. Did we get that document that the November 16th order asked for? Yes, Your Honor. Those documents were submitted to the court by they were sent to the court by Federal Express on November 25th and arrived. They're in the pile here. That's all right.  Thank you, Your Honor. Your Honor, with regard to our specialist, Dr. Castori, I believe that the government just made the point for the plaintiffs. Let me reiterate. Under Freedom to Travel campaign, where people wanted to go to Cuba, despite the fact that it was clear from the statutory scheme that they would have been denied permission to go to Cuba, this court held that there was no necessity to even make an application. In this case, Dr. Castori, even though he's a radiologist and clearly under the government's regulatory scheme is a specialist and can't qualify, nevertheless went ahead and submitted a national interest waiver petition. In the government's response to Dr. Castori, they said they listed the different categories of primary care physicians and said we don't understand why you're applying. You're a radiologist. You're a specialist. Give us a regulatory explanation of why you qualify. And at that point, it was impossible for him to do that. If his H-1B status had terminated by the time he had made the, I mean, by the time they ruled on it, he'd have to go, wouldn't he? His H-1 status had not terminated. If it had, definitely he would have had to leave the country. My point is if you can't, it works differently with the Department of Labor certification, but if you have an H-1B status that your time is up and you're trying to exhaust your administrative remedies, trying to get your case in court, you're just out of luck, right? That's all right. Yeah, he would go back to where he came from. Also, the government made a point about the statute not being retroactive. The statute specifically says that physicians who had a national interest waiver submitted on their behalf before November 1, 1998, which is a full year before the enactment date of the statute, are not subject to the five-year medical practice requirement. They're subject to a three-year medical practice requirement. And so, I mean, it is clearly retroactive from the clear language of the statute. Also, it's clear that the government used the language filed. The sentence before that said, well, for approved petitions before the statute was enacted, there is no time period at all that they had to meet. But for people that had national interest waivers filed for them a year before the statute took effect, it would be a three-year medical practice requirement. But it didn't say anything about whether it had to be pending at the date the statute was enacted. This is a condition subsequent that was added by the government agency playing the role of the legislature here, and I think they got very confused about that. Are there any questions? No, thank you. Thank you very much. This matter will stand submitted, and the court will recess until 9 a.m. tomorrow morning. Thank you.
judges: Pregerson, Noonan, Thomas